Wortman *v.* Skinner.

Between PETER WORTMAN, appellant, and NICHOLAS SKINNER and others, respondents.

If an administrator, at public or private sale, sells lands upon an agreement, made before or at the sale, that the lands are to be bid off in the name of some other person, but for his benefit, equity will set aside the proceedings as fraudulent in law. But any agreement made, however soon afterwards, with the purchaser for a conveyance to the administrator is not within the rule.

The rule has its operation on the *sale*, and the land is again instantly free for all the world to purchase.

Where two administrators sell land under an order of the Orphans Court, and one only of them executes the deed, equity will enjoin the heirs from prosecuting an ejectment to recover back the land upon the ground of such irregularity.

The facts of the case sufficiently appear in the opinions delivered.

The cause was argued in the Court of Chancery by *J. J. Scofield* and *V. Dalrimple* for the complainant below, who is the appellant in this court, and by *Jacob Vanatta* and *J. W. Miller* for defendants. From the decree made in the Court of Chancery the complainant appealed.

The following opinion was furnished by the Chancellor, as containing his reasons for the decree.

WILLIAMSON, C. The land in dispute consists of two tracts of land in Morris county, one lot called the Quimby lot, of ninety-one acres, the other the still-house lot, of one hundred and nineteen acres. Nicholas Emmons died in 1821, seized of this land, and of considerable other land in the county of Morris. He left ten children. The defendants are the heirs at law of Catharine Skinner, one of the ten children, who died in 1828, leaving a husband who survived her, and died in 1831. The defendants brought an ejectment in the Morris court to recover the two tracts of land of the complainant, who was in possession of the same. The defendants claim four equal

undivided eleventh parts of the two tracts as heirs at law of their mother.   Nicholas Skinner, one of the defendants, claims, in addition to the one eleventh as heir of his mother, two tenths, which he purchased of Abraham N. Emmons, one of the children of Nicholas, and of James Carr and Sarah his wife, which Sarah was one of the daughters of Nicholas Emmons, and three equal undivided tenths of one equal undivided tenth as grantee of three grandchildren of Nicholas Emmons.   The complainant and Isaac Emmons were the administrators of Nicholas Emmons.   All the lands of the intestate were sold under an order of the Orphans Court.   The complainant claims title to the premises in controversy in the ejectment through John Cooper and Jacob Emmons, who, the complainant alleges, were the purchasers from the administrators under the order of the court.

The complainant's bill admits the irregularity of the proceedings in the Orphans Court, by virtue of which the lands were sold.   The deeds to Cooper and Emmons were executed by the complainant, as the acting administrator of Nicholas Emmons, deceased.   He had no power or authority to execute such a deed as acting administrator. The proceedings in the court had been conducted in the name of both administrators.   They were directed to sell, and their joint action was necessary to give validity to a deed to the purchaser.   But the complainant asks the equitable interference of this court to protect his title, on the ground that the sale was *bona fide* made by the acting administrator; that the price was the full value of the lands; that the consideration money was paid and appropriated to pay the debts of the intestate's estate under the direction of the court; and finally, upon the ground that the heirs at law of the intestate, under some of whom the defendants claim, acquiesced in the proceedings through which the complainant acquired his title.

The defendants, in their answer, allege that the proceedings of the Orphans Court were fraudulently con-

trived by the complainant for the purpose of procuring title to the land in himself; that the personal estate was sufficient to pay the debts, and that the accounts exhibited to the court, which made the representation otherwise, were made up of fictitious demands.

If there was moral fraud on the part of the complainant, any corrupt management or contrivance on his part inducing the Orphans Court to make the order for the sale of the lands, then this bill should be dismissed.

The complainant would not be entitled to the equitable interference of this court to protect or ratify an imperfect or informal legal title procured by fraud. Under such circumstances, the complainant should be left to stand upon his strict legal rights. If there was no moral fraud, then the court may properly interpose and protect the title of the complainant upon such equitable terms as, under all the circumstances, equity and good conscience require to be imposed.

After a careful examination of the burthensome mass of testimony which has been taken in the cause, most of which is wholly useless, and worse than useless, for it throws upon the court a task which is scarcely endurable, of selecting a grain of wheat from a bushel of chaff, I have arrived at the conclusion that the evidence will not justify me in turning the complainant out of court on the ground of any *positive fraud* which has been practised by him. The facts have created doubts in my mind upon this issue between the parties; but there are several considerations which have induced me to resolve these doubts in favor of the complainant. The proceedings in the Orphans Court were grossly irregular, and the manner in which the estate was administered by the complainant most reprehensible. If a court could sanction such proceedings as the record in this case exhibits, it is but charitable to attribute the conduct of the administrator to ignorance and negligence, rather than to corruption.

But the heirs at law who complain of fraud were aware

Wortman *v.* Skinner.

of the proceedings at the time. Their attention was called to the accounts at the time they were exhibited. They cited the administrators to account, and when the accounts were exhibited, their attention was called to them. They had the benefit of counsel, as the record shows. That was the time to expose the frauds, if any existed. It is not pretended that their discovery of fraud is of recent origin. It is true that they then expressed their dissatisfaction; but that was the opportune time for action. More than fifteen years were allowed to elapse before any steps were taken to expose the alleged frauds. It is difficult for the complainant, after such a lapse of time, to explain many items of an account, upon the correctness of which strong suspicions are now cast. Besides, many of the mysteries which have not been explained in relation to the proceedings in the Orphans Court, connected with the sale of the lands, have resulted in part from the conduct of the persons interested, upon whom the frauds are alleged to have been practised. It is impossible for me to go into the details—it would make a volume. But take for illustration the matter of the awards. Why these awards were made? why they were assigned to Jacob Emmons? how they were to benefit, or how they did benefit the individuals in whose favor they were made? are questions to which no satisfactory answer can be given. The defendants say it was all a plan adopted by the complainant to defraud the persons interested in the estate; but this conclusion is not warranted by the evidence. The heirs at law, the alleged dupes of this supposed contrivance, were all actors with their eyes open. They signed the submissions, and were active in the proceedings. They made no complaint against the awards; and now, when no one can explain the object of all these proceedings, they ask this court to solve the mystery by attributing them to the fraudulent contrivance of the complainant. Again, as to the proceedings in the Orphans Court to procure the sale of the lands, there is

Wortman *v.* Skinner.

some evidence of acquiescence on the part of the heirs. They gave to the complainant powers of attorney to act for them, in which is recited the willingness of the heirs to have a part of the land sold for the payment of debts. But without adverting to any other considerations, I deem it sufficient to say, that after such a lapse of time, and under the circumstances which surround this case, the fraud should be made out very clearly. There is a doubt in my mind, and that is sufficient to bring me to the conclusion that the issue made by the defendants of actual fraud has not been sustained.

Although it is not necessary, after the conclusion to which I have arrived upon the question of fraud, to decide a point of some consequence made on the argument, it has received due consideration, and I have had no difficulty in my own mind in settling it. On behalf of the complainant, it was insisted that the question of fraud, as to the proceedings in the Orphans Court, could not be investigated upon this bill and answer; that their regularity or validity could not be collaterally called in question; and that, in order to do this, defendants should have filed a cross-bill putting these matters directly in issue. But all these matters are directly in issue by the present pleadings. They are made by the bill itself. The bill admits the irregularity of the proceedings of the Orphans Court, and asks this court to cure the defects in the proceedings, and to confirm the complainant's title under them. The bill alleges that, although irregular, the proceedings were *bona fide,* and it is upon this ground that the complainant claims he is entitled to the protection of a court of equity. The answer takes issue upon these facts, and denies the *bona fides* of the proceedings in the Orphans Court. It affirms and sets up a defence against the complinanat's equity; that they were fraudulent, and thatthe irregularities were all contrivances to cover up the fraud meditated by the complainant. Surely no pleadings by cross-bill could have put the proceedings of the

Orphans Court more directly in issue than they are by the present pleadings. The proposition of the complainant's counsel is correct, but in its application does not exclude the investigation of the fraud alleged in this case.

No cross-bill was necessary—the issue is properly before the court by the pleadings. The propriety of a cross-bill may frequently be judged of by looking at the decree which must follow the result of the investigation. In this case, had the court determined that the proceedings of the Orphans Court were fraudulent, the decree simply would have been to dismiss the bill. If the defendant had set up some equitable title, and prayed for affirmative relief, and a decree that their title should be established and confirmed, then a cross-bill would have been neces- sary. But the defendants ask for no decree. The com- plainant comes with an equitable title, and asks the court to protect it. The defendants come in, and say that no such decree should be made because the complainant's title was procured by fraud, and they offer to prove the fraud. Certainly there can be no rule of pleading to pre- vent the defendants making such a defence by their an- swer, and no rule of evidence to prevent their proving it.

To what relief is the complainant entitled ? The prayer of his bill is, that his title in the said premises may be decreed to be valid, and that the defendants be decreed to confirm his title, so far as they may have any right or claim thereto, and for general relief. If John Cooper and Jacob Emmons were the real purchasers at the adminis- trator's sale, purchasing in their own right, and subse- quently the complainant purchased of them, there being no positive fraud proved, this court would protect the complainant's title against the legal consequences of any mere irregularities in the proceedings in the Orphans Court relating to the sale of the land. If the administra- tor was the purchaser, either directly or indirectly, at his own sale, the court may in this suit declare him a trustee for the heirs at law, and reimburse him any advances he

Wortman v. Skinner.

may have *bona fide* made for the protection of the title. *Mulford* v. *Bowen and others*, 1 *Stockton* 797. I am perfectly satisfied from the evidence, although the property was struck off to John Cooper and Jacob Emmons, that they were but the nominal purchasers, and that they acted as mere agents to transmit the title to the complainant. In March, 1824, the order to sell was made, and the sale was made July, 1825. On the 20th of May, 1829, a deed was made for the still-house lot to John Cooper by the complainant, as acting administrator, for the consideration, expressed therein, of $687. By deed bearing date the 25th of May, 1829, and for the same consideration expressed therein as in the deed to Cooper of $687, John Cooper reconveyed the still-house lot to the complainant. Both deeds were acknowledged on the same day, the 25th of May, 1829, and recorded the 11th of June, 1830. In July, 1832, the complainant was cited to account. He charges himself in his accounts, which were exhibited to the court in September, 1832, under date of July 2d, 1825, " To amount of sales of ninety-one acres off of the south part of the homestead farm, at $5.35 per acre, Jacob Emmons purchaser, $486.85," and " to amount of sales of 119 50-100 acres of the aforesaid homestead farm, at $5.75 per acre, Capt. J. M. Cooper purchaser." In a subsequent part of his account, but under no particular date, are the following charges: " To amount of sales of the lot called the south part of the homestead farm, more than sold for at vendue, ninety-one acres, at $3.15 per acre, $286.65," and " to amount of sales of still-house lot, more than sold for at vendue, 119 50-100 acres, at $2.75 per acre, $328.62. On the 18th of March, 1834, the complainant made his report of sales. At that time he held himself the deed for the still-house lot. He also held a deed from Jacob Emmons for the Quimby lot, bearing date the 23d of March, 1833, although at that date Emmons had no title for the lot. On the 20th of March, 1834, two days after the report of sales, and a year, within

three days, after Jacob Emmons had executed a deed to
him for the Quimby lot, he, as acting administrator, con-
veyed the Quimby lot to Jacob Emmons. Both deeds
express the same consideration, but the deed from Em-
mons to the complainant is not acknowledged till 1840,
and is recorded in 1841. The explanation of all these
confused dates is to be found in the fact, that Cooper and
Emmons were acting as the mere agents of the complain-
ant.

The complainant, in his bill, attempts an explanation of
this transaction, as it appears upon the record and by the
date of the deeds. He admits that the property was not
struck off to Cooper and Emmons as the real purchasers,
but makes this representation: that when the property was
struck off, it was supposed by some to be at a low price,
and it was understood and agreed by the said administra-
tors and the heirs, who were then present, that it should
be struck off to the said Cooper and Emmons, and if there
could be obtained for the property afterwards a better
price at private sale, or otherwise, it should be conveyed
to such person as would give an advanced price, and that
Cooper and Emmons consented to hold the property for
the benefit of the estate; that the property was not taken
possession of by Cooper and Emmons as purchasers; and
after waiting two years, or thereabouts, and not being able
to obtain a larger price, the complainant agreed with the
heirs, or such of them as appeared to be interested, and
with the knowledge of the others, to take the said pro-
perty at a certain price agreed upon by the complainant
and the *said* heirs—one lot for $286.65 more than it was
struck off for, and the other for $228.62 more than it
was struck off for. The explanation, at best, is but a
poor one, and as poor as it is, is not proved. If this was
a *bona fide* purchase made by the complainant, how is it
that the arrangement was made with *some* of the heirs,
and with the *knowledge* only of the others? Why does
not the complainant name the heirs with whom the

2 H*

agreement was made? The complainant admits that the first agreement made, when the property was struck off to Cooper and Emmons, was made with the *heirs then present*. How many of the ten heirs were then present, the the bill does not state. The fair presumption is, that mentioning the number would not have strengthened the complainant's case. He states that when the second agreement was made, it was with such of the heirs as appeared to be interested, and with the knowledge of the others.

But there is no proof that comes up even to this imperfect statement. It certainly is not true that any agreement was made by the administrators and the heirs present at the sale that the property should be struck off to Cooper and Emmons upon the agreement stated in the bill, or upon any other agreement or understanding. I do not recollect any evidence in the cause to show that any one of the ten heirs was present at the sale. But the administrator, Emmons, was not there; and while everything is represented to have been done by both the administrators, one of them, Emmons, was absent several hundred miles distant at that time, and was never consulted as to the sale, and in fact knew nothing about it. There is no proof that the heirs made any agreement that the property should be struck off to Cooper and Emmons, or of the subsequent sale to the complainant, or there ever was in fact such agreement made by any one. There is no evidence that the heirs had any knowledge that Cooper and Emmons were mere nominal purchasers, or of the subsequent agreement made with the complainant to take the conveyance of the Quimby and still-house lots. Everything attendant upon the transaction was calculated to conceal all knowledge of its true character from the heirs; there were no deeds executed until years after the sale. The deed for one property was not made until four years after the sale, and for the other, not until nine years after. There was no deed to the complainant on

record for one of the properties until more than fifteen years after the sale by the administrators. No report of sales was made for more than sixteen years; in fact every avenue to information was closed up by the complainant himself.

The complainant has totally failed to show any such *acquiescence* on the part of the heirs as will deprive them of any of their equitable rights. Besides, there could have been no acquiesence that would bind these defendants. They claim under their mother, who died in 1828. The deed to Cooper was made a year after, and all material transactions were subsequent to the death of the defendant's mother and while they were infants. It appears to me perfectly clear that the complainant can only hold the property as against these defendants as their *trustee*, and that the accounts between them are to be settled in reference to such relationship.

The complainant is entitled to be reimbursed the purchase money he paid or accounted for in his settlement with the Orphans Court, and the interest on the same, and he must account for the rents and profits since he first took possession.

There were one or two matters which, on the argument, it was insisted should be considered as equitable liens on the property, should the court hold the complainant a mere trustee. On the 15th of May, 1822, Nathaniel Skinner and his wife, the parents of the defendants, executed to Jacob Emmons a mortgage on all their interest in the real estate of Nicholas Emmons, deceased, to secure the sum of six hundred dollars. Jacob Emmons died leaving a will, by which he made the complainant his residuary legatee. The complainant was executor of the will, and this mortgage came into his hands as such executor. He now produces the mortgage, and claims the amount due on it as a debt secured by a lien on the land in dispute. The defendants set up, in their answer, that Nathaniel Skinner and his wife did not owe any-

thing to Jacob Emmons at the time the mortgage was given; that Skinner at that time was much embarrassed, and that the object of the mortgage was to defeat his creditors. If this were so, it could not help the defendants. The mortgage was good between the parties to it; and neither the mortgagors, or any persons claiming under them as heirs or otherwise, could ever defeat the mortgage on such ground. But I do not think, under all the circumstances, that this mortgage should be considered as an equitable lien in the complainant's hands for the protection of his title.

It constituted no part of the consideration which the complainant gave for the property. It is evident, when the administrators struck off the property to Cooper and Emmons, it was understood that the property was sold free of this mortgage, and that when Jacob Emmons conveyed to the complainant the property was considered unencumbered. This mortgage was never assigned or handed over to the complainant for the purpose of protecting his title. I do not consider, therefore, that this should be considered an equitable lien upon this property.

Again, it appears, by the final accounts, that there was a deficiency of $757.44 of assets to pay the debts.

It is insisted that the defendants should pay to the complainant their proportion of this amount, and that such proportion should be decreed a lien upon their interest in the land.

The manner in which this estate was administered, the circumstances attending its final settlement, in connection with the evidence that has been adduced to show that if there was not, there ought to have been assets more than sufficient to meet the deficiency, present the case to the court in an aspect which does not entitle the complainant to invoke the aid of this court to make good the deficiency. It is not to be forgotten that it is not the defendants who are invoking the powers of a court of equity to pro-

tect their title. All they ask is to be left to their legal rights. My conclusion is, that all the complainant is entitled to, in taking the accounts, is the amount he accounted for to the Orphans Court and the interest. As to the amount of interest which the defendants have in the land, I do not understand that there is any dispute, except as to an interest which Nicholas Skinner purchased of Sarah Corwin, and to that it appears that the complainant had a deed from Sarah Corwin; the deed was executed to Skinner. If there is any serious dispute, however, as to the quantity of interest of the defendants in the land in controversy, I will hear counsel upon that question.

The appeal was argued by

*A. C. M. Pennington* and *P. D. Vroom*, for appellant.

*Jacob Vanatta* and *J. W. Miller*, for respondents.

The following opinion was delivered by

VREDENBURGH, J. In 1848, N. Skinner and others, the appellees in this court, and the defendants below, brought an ejectment against Wortman, the appellant and the complainant below, in the Morris circuit, to recover certain undivided shares of two tracts of land.

The ejectment being noticed for trial, Wortman, in 1852, filed his bill in Chancery against the defendants, stating that both parties claimed title under one N. Skinner, who died intestate in 1821; that he and one Isaac Emmons were the administrators of said deceased, and as such, were ordered by the Orphans Court of Morris, in March term, 1824, to sell the said land to pay debts; that they did so sell them, on the 2d July, 1825, to John Cooper and Jacob Emmons; that his co-administrator having moved out of the state, he alone executed the deeds to Cooper and Emmons, received the consideration money, and paid it out to the creditors, and that after-

Wortman v. Skinner.

wards the said purchasers conveyed the same to him, the complainant; that the defendants claim title as heirs at law of the said intestate, and that his reasons for coming into Chancery are, that he expects that the defendants intend to impeach his title at law—first, upon an allegation that the deeds so made to Cooper and Emmons were in trust for himself; and secondly, upon the ground that said deeds are signed by himself only, and not by both administrators;—and he insists that he is not compelled to run the hazards of this informality at law, but is entitled to have his title confirmed and quieted in equity. He therefore prays an injunction that his title may be decreed to be valid; that the defendants be decreed to confirm the same, and for other relief.

The defendants answering admit that they claim as in said bill is alleged, and that the deeds were made to said Cooper and Emmons, and by them to complainant, as charged, but say that they know nothing about the pretended sale on the 2d July, 1825, and deny that the said Cooper and Emmons were *bona fide* purchasers; and they aver that the said deeds from the complainant to them, and from them to the complainant, were executed on the same day, and were only colorable and to enable the complainant to get the lands, and that they are void in law and equity, and they ask for no relief. The Court of Chancery decreed that the complainant was not entitled to his specific relief because Cooper and Emmons were merely nominal purchasers, and that they acted as mere agents to transmit the title to the complainant; that he must account to them for the rents and profits from the 1st of April, 1827, to the present time, and upon being credited out of such rents with the purchase money and interest, convey to the defendants free from all encumbrances.

From this decree the complainant has appealed.

Two general questions are presented for consideration.

1st. Is the decree right as it stands?

2d. If not, what should be the action of this court thereon ?

*First.* Is the decree right as it stands ?

The whole decree is based upon the finding below that the complainant is a trustee for the defendants.

Do the pleadings and proofs show that the complainant in this matter was in fact but a trustee for the defendants ? If they do, it must be upon the ground that he has been guilty of fraud, either in fact or in law. As to fraud in fact, the Chancellor was of opinion that it was not proved. In this I entirely concur. Not only have the pleadings and proofs failed to satisfy me of actual fraud, but in this mass of rubbish, the collections of over a quarter of a century, I have not been able to find a scintilla of it. I see in it irregularities, a total want of guarding against any accusation of fraud, but upon every question touching the real merits of the transaction I see nothing but the evidence of the most scrupulous good faith; and if the declining years of the complainant are now harassed by this litigation at the instigation of these heirs, it is probably owing to the fact, that in his early manhood he guarded with more care than the law enjoined upon him the interest of their ancestors.

*Second.* Has the complainant been guilty of fraud in law ?

It is insisted by the defendants, and so found by the Chancellor, that the sale by the administrators to Cooper and Emmons was only colorable; that Cooper and Emmons bid off the property *for the complainant,* and afterwards made the deeds to him in pursuance of that arrangement. If this be so, it would be a legal fraud, rendering them voidable in equity, however honest the thing might be in fact.

Let us first see, before considering the evidence, what this doctrine, as applied to the case before us, really is. My understanding of it is this—that if an administrator, at public or private sale, sells land to another, upon an

agreement made before or at the sale, that such person shall buy or bid off not for himself or for others, but for the administrator, that the purchase money is to come from him, and the deeds made from him to the bidder, and by the bidder back again to the administrator, in pursuance of said agreement, then equity will set aside the proceedings as fraudulent in law. But if the purchaser bids not for the administrator, but for himself or for the heirs of the deceased, or for anybody else, then the principle does not apply. The rule was made from considerations of public policy, to prevent the land from being sold under value by the secret machinations of the administrator; and therefore such agreement and arrangement must be made and exist before and at the very instant of the sale. Any agreement made, however soon after it is struck off by the administrator to the purchaser, is not within the letter, the spirit, or the meaning of the rule. The rule has then had its operation upon the sale, and the land is again instantly free for all the world to purchase. The very reason for establishing the original rule requires this construction of it, otherwise it would produce the very evil it was intended to guard against, by restricting to that extent the power of the purchaser to alienate. Applying these principles to the case before us, if Cooper and Emmons, on the 2d July, 1825, bid off this property for the complainant, which was carried out by the subsequent execution of the deeds to the complainant, then the complainant was at that time, and has been ever since, but a trustee for the defendants, and his title is voidable in equity. But if such was not the fact—if the purchase was made on the 2d July, 1825, not for the complainant or for his benefit, but for the benefit of Cooper and Emmons or of the heirs of N. Skinner, and the deeds from Cooper and Emmons to the complainant was by virtue of an arrangement made after the 2d July, 1825, then there was no legal fraud in the transaction. Immediately after the property was struck off on the 2d July, 1825,

the complainant had as good a right to buy from those to whom the property had been struck off as anybody else, and it would then be in him fraud, neither actual nor legal. Equity only looks to getting the highest price for the property; everything else is in its eye mere formality.

It will be recollected that the complainant was no heir of the intestate. His mother was, but not he.

How stands the fact, then, upon the pleadings and proofs? Did Cooper and Emmons, on 2d July, 1825, bid off this property for the benefit of the complainant or for the benefit of the heirs of N. Skinner? If for the former, it was fraud in law—if for the latter, it was not.

The bill avers that the sale of said land was made by said Cooper and Emmons for the largest price they could get for the same at public sale, and deeds subsequently made to them; therefore that such sale was made on the 2d July, 1825, in pursuance of the order of the Orphans Court and of advertisements made according to law, and that the lands were sold to them at public sale in a fair and open manner to the highest bidder, and for a fair and full consideration, and for as much as could be obtained for the same, and in good faith and for the best interest of the estate and for the benefit of the heirs of N. Skinner; that the complainant, after waiting two years in hopes of receiving the purchase money, and neither the heirs nor their agents, Cooper and Emmons, paying it, and the property being in a very low condition, and bringing little to the estate, and the heirs being unable to get any advance upon the bid, he voluntarily, two years after the sale, about the 5th of April, 1827, stepped forward and bought the property of Cooper and Emmons, and actually gave to them $615.27 more than they had agreed to pay, and thus not only enabled them to perform their contract, but also appropriated the advance, as well as the original sum, to the benefit of the heirs, and then, in pursuance of said purchase, went into possession, which he has ever since retained.

If this be true, the property, on the 2d July, 1825, was not sold for the benefit of the administrator, but for the benefit of the heirs. The complainant was no trustee of the defendants, nor within the letter or spirit of the rule.

The answer is very voluminous, but only an infinitesimal part is upon personal knowledge. It piles up a vast mass of allegations of fraud in fact; but I have been unable to find in it any allegation, even upon belief or information, that the sale of the 2d July, 1825, was for the benefit of the complainant, or any denial of the allegation, that the sale of the 2d July, 1825, was for the benefit of the heirs. The answer alleges that there was no sale at all to anybody at any time, and that *when the deeds were made* to Cooper and Emmons they were made under an agreement that the property was to be immediately deeded back to the complainant. But this was some two years after the sale of the 2d July, 1825, and after the complainant himself alleged he had made his contract with Cooper and Emmons to purchase it of them.

It is a matter of no concern what took place in that regard *then*—the vital question is what took place on the 2d July, 1825, before and when the property was struck off to Cooper and Emmons. All I have discovered in the answer upon this point is, that they have no knowledge of their own about the pretended sale, in said bill alleged to have been made on the 2d July, 1825; and that, from all the information they have been able to gather in relation thereto, they are led to and verily believe that there was no public sale of said lots, or either of them, on the 2d July, 1825, or at any other time. I find no allegation in the answer, even upon information or belief, that these lots were struck off on the 2d July, 1825, for the benefit of the complainant, so that the question is not even raised by the answer, that this property, on the 2d July, 1825, was struck off for the benefit of the complainant. But even if there had been such an allegation in the answer, we should want some proof before we would

deem it to be so.  Where the deeds from the administra-
tors back again are made very soon after the sale, it
might create suspicion, but here the deeds were not
made for a long time afterwards; and we can imagine
many other reasons for the retransfer besides an original
agreement to that effect.  But if there was any doubt upon
the pleadings, the question is entirely cleared up by the
evidence.  There is but one unvarying current of testi-
mony by all the witnesses who were present, or who
knew anything of the transaction, that the sale of the 2d
July, 1825, was for the benefit of the heirs, and not of the
administrator, and that the interest of the administrator
arose about two years afterwards, and upon an entirely
new and distinct consideration.  It appears to me, there-
fore, that the sale by the complainant to Cooper and Em-
mons was not fraudulent in law, and that the complain-
ant is not, and never was in that regard the trustee for
the defendants, and that, consequently, the decree must
be reversed.

The next question is, shall we decree specific relief, dis-
miss the bill, or remit to Chancery.

Convinced, as I am, that the proceedings of the com-
plainant, however technically irregular, have been entirely
upright and honest, and that the last ten years of his life
have been unjustly annoyed with this litigation, I think
we should decree specific relief, and dispose of this cause
at once and for ever, if we can do so consistently with
the law and the evidence.

*First.*  Can we grant specific relief?  This involves the
following considerations.

1st.  Was there a sale at all on the 2d July, 1825.

2d.  If there was, was it made by both administrators.

3d.  If it was, is it fraudulent in law.

4th.  Or was it fraudulent in fact.

5th.  If it was a *bona fide* sale by the two administra-
tors, does the fact that the deeds were signed by one only
of the administrators afford ground for equitable relief.

*First.* Was there, on the 2d July, 1825, any sale at all? The bill avers, under oath, that there was. The defend-ants, in their answer, say they know nothing about it, but do not believe there was. A sale was demanded by the condition of the estate—the sole object of all these proceedings was to effect that very object; the estate was indebted to the administrators, and it was only through a sale he could expect to get his money. He applied to the court for power to sell, and they so ordered. The premises were repeatedly advertised for sale in the usual way. At these sales, all the other lands of the deceased were sold, and are still held by the purchasers. The deeds aver the sale. In 1832, the complainant charges himself with the purchase money, and disposes of it in the course of administration.

The report of sales to the Orphans Court, in 1834, avers that the premises were advertised, and exposed for sale on the 21st May, 1825, and adjourned at a less bid to 2d July, 1825, when they were struck off and sold to Cooper and Emmons, as the highest bidders. The Orphans Court, in their order, after reciting that it appeared to them that the sales had been advertised according to law, decree that they approve and confirm the same. The complainant himself made the deed, and took the title under the faith of a sale on the 2d July, 1825. All par-ties, ten needy heirs, living on and near the premises, and present at the vendue, acquiesced, all of them, in it as a sale from July 2d, 1825, until 1848, and then this suit is brought by their descendants. The account given by the complainant of the sale is entirely rational and probable under the circumstances. But more than this, both Smith and Van Vliet testify, with entire clearness, that they were present on the 2d July, 1825, and that these lands were then publicly struck off and sold by the adminis-trator to Cooper and Emmons, who were the highest bid-ders for the same, for the benefit of the heirs, and no one

contradicts them. It is true that Cooper and Emmons did not bid for themselves, and that was understood all round. This was a question entirely between Cooper and Emmons and the heirs. It did not make it less a sale between the administrator and Cooper and Emmons. The agreement of the administrator, that if Cooper and Emmons were the highest bidders, it should be struck off to them for the benefit of the heirs, did not take away from it the character of a sale. It was struck off to bar that very conclusion, and for the very purpose of making it a sale. The administrator could not help, if he sold at all, to strike it off to the highest bidder, nor could he hinder them from bidding it off for whose benefit they pleased; and whether he agreed to such an arrangement, was a matter of entire indifference. After all this, it is too much to call upon us to doubt the fact, that on the 2d July, 1825, these lots were publicly struck off and sold by the complainant to Cooper and Emmons: that fact bound the complainant to the creditors, and Emmons and Cooper and their principals, the heirs, to the administrators for the purchase money. It was not the less a sale by the administrator because Cooper and Emmons bought it for the heirs; nor is it less a sale by the administrators because they saw fit to indulge Cooper and Emmons, or their principals, the heirs, by waiting for the purchase money, or because they agreed to wait for it for some time, to enable the heirs to make more out of the property. Cooper and Emmons or the heirs might never comply, or might be long in making payment; but it was, as between the administrators and the creditors, and the heirs and Cooper and Emmons, a regular, valid, and *bona fide* sale, and which the parties had a right to carry out and consummate at any time afterwards, no one having a right to complain of delay except the creditors.

It is objected that Mrs. Skinner was not party to this arrangement of the sale on 2d July, 1825. It makes no difference if she was or not. Her rights, whatever they

2 I*

were, were subject to the rights of the creditors, and lia-
ble to be divested by proceedings for their benefit. If she
or her husband was no party to the understanding be-
tween the heirs and Cooper and Isaac Emmons, it only
goes to show that she was not entitled to any share of the
advance paid by the complainant, but it does not affect
the validity of the sale.

*Second.* Was it a sale by both administrators?

Isaac Emmons, the other administrator, had moved
into the state of New York. It does not appear whether
he was or was not present at the sale. I am not aware
that it is necessary that both administrators should be
continually present on the ground at a public sale, to
make it, in the contemplation of law, the sale of both.
There is no evidence that Isaac Emmons has ever dis-
sented. We must therefore assume, at this distance of
time, that he acquiesced.

All the other real estate was sold in the same way; and
if the objection is valid as to this, it is valid as to all the
other property. All the proceedings up to the deed are in
the joint name of the administrators—the inventory, the
rule to show cause, the order for sale, the report of sales,
the advertisements for sale, the final account, the citation,
—are all in their joint names, and the sales were con-
firmed by the court as the sale of both. The order to sell
was upon both. Isaac Emmons was one of the adminis-
trators, and we are to presume that he knew the condi-
tion of the estate, and that a sale was necessary. All the
presumptions are that he acquiesced in the sale of 2d
July, 1825, and that the said sale was the joint sale of
both administrators.

*Third.* Was the sale fraudulent in law? This has been
already fully considered.

*Fourth.* Was the sale fraudulent in fact? With the de-
cree of the Orphans Court standing unreversed; after all
the original parties of full age living near partaking in
these proceedings, themselves receiving a large propor-

tion of the proceeds of this dishonesty, if any there were; after acquiescing for a quarter of a century; after they have gone to their graves, to permit the *bona fides* of this transaction to be brought in question in this collateral way by a succeeding generation is in discord with every principle of law or equity.

Mr. Vliet, one of the heirs, says—in 1832, he went, after the settlement in the Orphans Court in 1832, at the request of some of the heirs, to examine the accounts. He was then familiar with all the items: he says they were all correct, and he was perfectly satisfied. It is idle to particularize further. The evidence of the *bona fides* of the transaction is multitudinous—it is stamped upon almost every page of this voluminous testimony.

The only remaining question is—is the fact, that these deeds are signed by one only of two administrators, such a defect as to entitle the complainant to equitable relief.

The Orphans Court controls the proceedings up to and including the report and confirmation of the sales, and then the statute steps in, and commands the administrator to make a deed to the purchaser. The statute (*Rev. Laws* 435) says, that any administrator may apply for order to sell. The court may order any administrator to sell. The court ordered here the two administrators to sell—they did sell. The statute says the said administrator shall make a deed—the said administrator here did make the deed. Now admitting this to be, as is claimed by the defendants, a fatal defect at law against the complainant's title (but which I very much doubt), it appears to me, within the plainest limits of equity powers, to be the duty of Chancery to relieve against it.

It has been taken for granted in the pleadings and in the argument. The Chancellor says—"If Cooper and Emmons were the real purchasers at the administrators' sale, purchasing in their own right, and subsequently the administrator purchased of them, there being no positive fraud proved, this court would protect the complainant's

title against the legal consequences of any mere irregularity in the proceedings of the Orphans Court relative to the sale of the land." And I see no reason why it should not be done. In considering this question, I shall treat the complainant as I think he has a right to be treated, as a *bona fide* purchaser holding by mesne conveyance under the administrator.

The question gives rise to three considerations.

1st. Is it a case where equity has the power to interfere.

2d. If it has, ought it, under the facts, to interfere.

3d. Can relief be given in the present position of the pleadings.

*First.* Is it a case where equity has the power to interfere? Chancellor Kent, in his *Commentaries, vol.* 4, *p.* 344, says —" though it is an immutable rule that the non-execution of a naked power will never be aided, yet if the power be one which it is the duty of the party to execute, he is a trustee for the exercise of the power, and has no discretion whether he will or will not exercise it. Chancery adopts the principle as to trusts, and will not permit his negligence, accident, or other circumstances, to disappoint the interest of those persons for whose benefit he is called upon to execute it. This principle, according to Lord Eldon, pervaded all the cases. The equity jurisdiction, in relieving against the defective execution of powers, is exerted in the case of a meritorious consideration in the person applying for aid. The assistance is granted in favor of creditors and *bona fide* purchasers who rest their claim upon a valuable consideration." These principles are fully borne out by the authorities referred to.

It appears to me that the case before us is most clearly within these principles. Here the administrator is expressly commanded by the statute to make the deed. It is not only the duty of the administrators to make the deed, but they are expressly commanded by the statute to do it. They have no discretion whether they will or

not. Suppose there had been no deed at all executed by the administrators, but they, having received the purchase money, set the purchaser at defiance, would not Chancery have compelled them to execute deeds, and considered the heirs and administrators as trustees for the purchaser? Suppose the administrators had both died after receiving the purchase money, would not Chancery have ordered their successors in office to have executed it, or if no successors, would it not have enjoined the heirs from proceedings at law?

If an executor is ordered by the will to pay debts, will not equity compel the executors to sell and make deeds? if they die, will it not appoint new trustees to carry the will into execution? If it will do that when a private person orders his executors to sell, will it do less when the same thing is the command of a statute? I take it, that as long as executors or administrators are proceeding within the powers of the Orphans Court, that court will compel them, at each step, to proceed according to the provisions of the statute: when it passes without their jurisdiction, equity will take it up, and compel the execution of the trusts.

If relief in this case is within the power of equity, is this a case where it ought to be exercised? I cannot conceive a more meritorious case. The sale was *bona fide*—the purchase money has been paid—it has been received by these defendants in contemplation of law. The defect is one of pure formality.

*Third.* Can specific relief be given in the present position of the pleadings?

*Story,* in his *Equity Jurisprudence,* § 177, says—"Equity will not interfere in regard to powers which are in their own nature statutable, where equity must follow the law, be the consideration ever so meritorious. And indeed it may be stated as generally, though not universally true, that the remedial power of a court of equity does not apply to the supplying any circumstance, for the want of

which the legislature have declared the instrument void; for otherwise the court would in effect repeal the very policy of the legislature." And again, in § 96, he says —"But in case of defective execution of powers, we are to carefully distinguish between powers which are created by private parties and those which are specially created by statute, as for instance, powers of tenants in tail to make leases. The latter are construed with more strictness, and whatever formalities are required by statute must be punctually complied with, otherwise the defect cannot be helped, or at least may not perhaps be helped in equity; for courts of equity cannot dispense with the regulations prescribed by statute, at least where they constitute the apparent object and policy of the statute."

Now if Isaac Emmons, the other administrator, had been a party to these proceedings, the court could have enforced a new deed by both administrators, and then there could have been no argument that this doctrine of Story would apply. But would specific relief upon the pleadings, as they stand, come at all in collision with the doctrine of the text? I do not see how it can. The text, as well as the authorities upon which it is founded, goes no further than to say that the Court of Chancery will not assist to violate a statute. As for instance, if this case had been like the one of ——— ——— decided by Chancellor Vroom in ——— there is no doubt but that the doctrine of the text would apply, and Chancery would not interfere. That was a case where the administrator sold at private sale, whereas the statute orders it to be done at a public sale. The Orphans Court in that case might interfere, and order a resale, and compel the administrator to sell at public auction, but clearly Chancery could not repeal the statute by declaring such sale to be valid. And of the same nature are all the cases upon which the text of Story is founded.

. . So here, if this statute had said no deed shall be valid unless signed by all the administrators, Chancery could

order and compel all of them to join in a new conveyance, but could not declare a deed good signed by only one. But is the one before us any such case? Does the statute say, that unless both administrators sign the deed, it shall not be valid? It does no such thing. And in declaring a deed executed by one administrator good, Chancery violates neither the letter, the policy, or the spirit of the statute; on the contrary, it is acting in aid of them all, and it comes fully within the principle we have before stated, that Chancery will compel the execution of such a trust. It is at most but a mere defective execution of a power which equity will relieve against in the case of a meritorious consideration in the person applying for aid. Not only is the Court of Chancery here not asked to do anything in violation of the statute, but the statute looks to the land as assets for the payment of debts, and which one administrator may sell, and to the sale by the administrators *virtute officii,* and not by virtue of any personal confidence, and which one administrator may well execute.

If after the report of sales, even before the purchase money had been paid, the administrator or purchaser had come into Chancery alleging that the co-administrator had moved out of the state, would that court, upon the principle that they would carry out trusts, have hesitated to order the administrator to make a deed to the purchaser? If so, have they not now the same power in this suit to declare one already made valid to pass the title.

Again, where a testator orders his executors to sell to pay debts, and for any reason they cannot convey without leaving a cloud upon the title, it is common for equity to decree that the heirs shall join in the conveyance, and to restrain them from proceeding at law. I do not see why the principles of these decisions do not apply to the present case with even more force than they do to a will. In the case of a will, it is to be presumed that some personal confidence is reposed by the testator in the execu-

tors. But here the proceeding by the administrator is purely *virtute officii.* If Chancery will enforce the order of the testator, will it less enforce the command of the statute? This question came directly, under a statute like ours, before the Supreme Court of Illinois in the case of *Thorp* v. *McCollum,* 6 *Gil.* 629.

The court there say—"No trust will fail in equity for want of a trustee. The general rule ought to depend on the nature of the power and its objects. Executors and administrators have a power, connected with a trust, in collecting, selling, paying debts, and distributing the surplus. If there are no limitations in the will restricting the persons or manner of executing these powers, the court will aid to give effect to a fair sale, which cannot take effect otherwise on account of a defective execution of the powers conferred by law. In attempting to perform these duties, the administrators make a sale, and only one of them executes the conveyance. Here is a defective execution of the power by one, which the law has conferred on both. But it partakes so much of the nature and qualities of a trust that the court will, to a certain extent, discharge the duty in his room and place, by compelling the other administrator, in a proper case, to join in the conveyance. *Rev. Laws of Illinois* 1833, *p.* 644, § 98; 2 *Mun.* 129; 1 *Russ. & M.* 418; 8 *Ves.* 570; *Fonbl. Eq.* 54; 2 *Will. Ex'rs* 689; *Harris* v. *Ingleson,* 3 *P. Will.* 92; *Parsons* v. *Parsons,* 9 *N. Hamp. R.* 309; 2 *P. Will.* 222; *Bryth* v. *Boyd,* 1 *Story's R.* 487; *Hill on Trustees* 85, § 192; 2 *Sugd. on Powers* 100, *note;* 2 *Ves. jun.* 357; 2 *Met. R.* 243; 5 *Ves.* 856; *Kemp* v. *Kemp,* 4 *Kent* 326; 5 *Ves.* 722; *Buchanan* v. *Hamilton,* 8 *Barr* 417; *Zebart* v. *Smith,* 3 *Binney* 73; *Brown* v. *Higgs,* 5 *Ves.* 498.

It appears to me that the relief prayed for is clearly within the jurisdiction of the Court of Chancery, and ought to be granted under the pleadings and proofs as they stand, and that the decree should be reversed, and a perpetual injunction be awarded.

Potts, J.   I concur with the view taken by the Chancellor in this case in the court below, except as to the relief he has decreed.

He decrees Wortman to hold the land as trustee, and directs him to account. The will prays for no such relief, nor is it agreeable to the case made by the complainant. 1 *Daniel's Pr.* 434–5–6, *and notes; Mitford's Eq. Pl.*, *by Jeremy*, 38, 45; *Cooper's Eq. Pl.* 13, 14; *Story's Eq. Pl.* § 40, 41, 42, *and notes.*

For this reason I concur in reversing the decree, and remitting the cause to the Court of Chancery; but to the end that the complainant may be allowed to amend his bill, or the defendants to file a cross-bill, making a proper case for such relief. If neither party should adopt the course suggested, my opinion is the court below should dismiss the bill.

Elmer, J.   The Chancellor, by his interlocutory order, denies the specific relief prayed for, and decrees that the complainant is only entitled to hold the land and premises described as against the defendants, as their trustee, and for their use and benefit; orders that it be referred to a master to take an account of the principal and interest money due to complainants, or the amount be accounted for as the proceeds of the land sold, and also an account of the annual value of said lands, and of the rents, issues, and profits thereof; and if upon the taking of said account it shall appear that the amount of the yearly value of said lands, and the rents, issues, and profits thereof received shall equal or exceed the amount of the principal and interest moneys which shall be found due to complainant, then the complainant shall convey to the defendants the shares of said land free of encumbrance; and if it shall appear that the said principal and interest moneys exceed the amount of the yearly value, rents, and profits, when the said defendants shall pay to the complainant their proportionate parts of said last mentioned

excess, the said complainant shall convey to the said defendants, respectively, their shares thereof free of encumbrance.  If in taking the account any special matter shall arise, the master to be at liberty to state the same to the court.  The amount of the interest the defendants respectively have in said lands, and the consideration of the costs and of all further directions are reserved.

From this decree the defendants did not appeal, but the complainant appeals, and alleges himself aggrieved thereby in these respects, viz. that the decree adjudges that he is not entitled to the relief specifically prayed for in his bill, and that he hath held, and shall hold the premises as against the defendants, as their trustees and for their use and benefit; that it adjudges there is a liability to account for a proportion of the rents and profits of the said lands; that the said decree declares that a certain mortgage and balance due the complainant on the settlement of his accounts should not be brought into the account; and that the said decree orders the said complainant to convey to said defendants, respectively, their respective shares of said lands free of encumbrances.

Upon the argument before this court, the first point made for the appellant was, that he is entitled, upon the pleadings and proofs, to a decree for the relief specifically prayed for by his bill, that is to say, that his title to the lands in question be declared valid, and that the defendants be directed to confirm the same, and that they be perpetually restrained from further prosecuting their action of ejectment therefor; no actual fraud having been proved against the complainant, the Chancellor so decreeing, and thereupon refusing to dismiss the bill. It was insisted that the decree is therefore erroneous in declaring that the complainant is not entitled to such relief, in denying the same, and in further declaring the complainant to be trustee of the said lands for the defendants, and that he shall account for and pay over the annual value, and the rents, issues, and profits thereof.

Is the appellant entitled, upon the pleadings and proofs, to a decree for the relief specifically prayed for by his bill, as thus stated? This is the important question in the case. It appears, by those pleadings and proofs, that the title he seeks to have confirmed rests upon deeds which he executed as acting administrator of Nicholas Emmons, deceased, while his co-administrator was alive, but as it would seem absent from the state, by virtue of an order of the Orphans Court empowering the two administrators jointly to make the sale. It has always been held, in this state, that administrators, commissioners, and sheriffs, who sell land by virtue of an order in pursuance of our statutes, having no interest, execute a naked power under a special authority, which must be strictly pursued. *Den* v. *Lambert*, 1 *Green* 182; *Den* v. *Philhower*, 4 *Zab.* 796. The sale in this case was made before the act of 1837, (*Elm. Dig.* 494, § 38,) which first directed the sale to be reported to the Orphans Court, and confirmed before a deed is made, for the very purpose of making such sales judicial, and applying to them the presumption of correctness thus arising. The act in force when this sale was made directed the administrator to report his proceedings to the next Orphans Court after the sale; but that was for the purpose not of confirming it, but to authorize him to be charged with the proceeds as assets. It was conceded, on the argument, that these deeds were not sufficient to pass the title and divest the heirs of the estate they took by inheritance. In fact this defect, and the allegation that the defendants sought to recover their shares of the land in the action of ejectment by taking advantage of it, and also by showing that Cooper and Emmons purchased the property for the complainant, and with the intent that the said land should afterwards be conveyed by them to him, form the main grounds upon which the complainant rests his claim to relief in equity.

The opinion expressed by the Chancellor, that although many suspicious circumstances appear in the case, the

evidence does not establish such actual and designed fraud as ought to deprive the complainant of all claim to relief in a court of equity, I think correct. The money he agreed to pay for the property was accounted for by him in the settlement of the estate, and was thus appropriated to the benefit of the heirs now prosecuting the ejectment. There seems no reason to doubt that the deeds were executed by the complainant, as acting administrator, ignorantly rather than with any fraudulent design— ignorance unfortunately not uncommon in the administration of estates. One administrator having a right to act alone in most matters pertaining to the administration, this right has often been supposed, by those intrusted with such duties, and even by our surrogates, upon whose advice they often rely, to apply to cases of joint duties depending upon statutes which require to be strictly executed.

But, in my opinion, there is no principle that will authorize a court of equity to confirm a title to real estate which is to divest the heirs of their inheritance, unless the title has been so conveyed as to be good in law, or the circumstances of the case will justify a decree ordering the deed to be reformed, or the conscience of the heirs can be affected with an equity which makes it unjust for them to take advantage of the defect.

In the case of *Thorp* v. *McCullum*, 1 *Gilm., Ill.,* 614, where one administrator made a deed to his co-administrator, who afterwards sold the property, and the heirs commenced an action of ejectment against the purchaser, whereupon a bill was filed to reform the deed and enjoin the action of the heirs, which under the circumstances was denied, the judge who delivered the opinion thought the court would not permit advantage to be taken of such a defective execution of a power, but would compel the co-administrator to join in a deed. He says: "if it were a mere power the court would not; but where there is a duty and a trust to be performed for the proper exercise

Wortman v. Skinner.

of the power, as here, the court will. 8 *Vesey* 570; 1 *Atk.* 469." Upon referring to the cases of *Brown* v. *Higgs*, 8 *Ves.* 570, and of *Harding* v. *Glyn*, 1 *Atk.* 469, it will be found, I think, that they do not justify the use made of them. The distinction there referred to is that between a mere power or discretion to do or not do a particular thing, which will not be enforced or aided, and a duty or trust to do the thing, which will be enforced for the benefit of those entitled. The duty or trust reposed in the administrator, to sell lands to pay debts, is for the benefit of the creditors, and may be enforced by them; and if defectively executed may, perhaps, be reformed for the benefit of a *bona fide* purchaser ignorant of the defect. But even if the bill in this case prayed for this relief, or was so framed as to justify it, which is not the fact, the propriety of doing it for the benefit of the wrongdoer himself would be more than questionable.

As is forcibly said by Chancellor Kent, in the case of *Lyon* v. *Richmond*, 2 *Johns. C. R.* 60, "the court does not undertake to relieve parties from their acts and deeds fairly done, though under a mistake of the law. Every man is to be charged at his peril with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind." If it be admitted, as was so earnestly insisted on in the argument, that the purchase of this property by the complainant was really at the instance of and for the benefit of those persons who at the time of the sale were the heirs, they are in no wise chargeable with the error in passing the title. It is not alleged or proved that they were consulted about the execution of the deeds, or had any knowledge of the manner in which it was done. The case presented is one of gross neglect upon the part of the administrator, much aggravated by the strange delay that occurred of nine years in making the titles and reporting the sale, under which he now claims the property himself; neglect for which the defendants and those under whom they

2 K*

claim are no wise responsible, the consequences of which ought to fall on his own head. To ask a court of equity to confirm such a title, is to ask it to sanction the most inexcusable ignorance and negligence in a person undertaking the responsible duties of an administrator, in regard to which he was bound to inform himself. Had the defect been the result of a mistake in some fact, or of some concealment, fraud, or contrivance on the part of the heirs, such circumstances might have entitled the complainant to the relief he seeks; but nothing of this kind is alleged.

It was insisted that the defendants are chargeable with such delay in prosecuting their rights as ought to preclude them from recovering the land. Had they come into court seeking the extraordinary aid of equity, this, perhaps, might have been a good reason for denying it. But they are simply prosecuting their legal rights, and cannot be restrained from doing so because of delay. If the statute of limitations has imposed a bar, the complainant can avail himself of that defence at law. I am therefore of opinion that the Chancellor was right in decreeing that the complainant was not entitled to the relief specifically prayed for in his bill.

Whether he was entitled to any other relief, was a different question. The frame and structure of his bill, in my opinion, entitled him, under his prayer for general relief, to that which was actually decreed to him. It is therein stated that he had purchased the lands in dispute at a fair *bona fide* sale for a full consideration, and had accounted for the purchase money. This being substantially proved, entitled him, in equity, to the return of the purchase money, and to hold the land, as against the heirs, until it was repaid to him. To give him this relief, it became necessary that an account should be taken, as ordered in the decree. This is for the benefit of the complainant, and, even if erroneous as against the defendants, cannot be set aside because they have not appealed.

Wortman *v.* Skinner.

The second point made for the appellant was, that no decree could rightfully be made upon the pleadings and proofs; that the complainant is trustee of the defendants, or that he accounts, inasmuch as the effect of the same is to afford affirmative relief to the defendants, without a cross-bill praying the same, or anything in the original bill on which to found a decree to such effect. That the original bill does contain matter on which to found a decree to such effect appears to me clear. The decree is not, as was insisted, a decree for relief to the defendants; they need no relief—they seek none. They ask to be left to prosecute their right to their inheritance according to the law of the land. The Chancellor was of opinion that the complainant had an equitable claim to prevent this—not absolutely, but until he is reimbursed what he has paid for the benefit of the heirs, and he therefore gives him relief on terms according to the well established and most beneficial practice of courts of equity. The decree is for the complainant, and may be enforced by him or not, as he thinks best. If he desires to do so, there is nothing to prevent him from dismissing his bill upon the usual terms.

If it be admitted that the Chancellor was wrong in giving this relief upon the ground he assumes, namely that the complainant was a purchaser at his own sale, and that the case is to be likened to that of *Mulford* v. *Bowers*, 1 *Stock.* 797, a question I do not think it necessary to investigate, it does not follow that his decree is to be reversed at the instance of the complainant, if it in fact gives him all the relief to which, in any aspect of the case, he is entitled, as in my opinion it does. It was urged that a cross-bill was necessary, because there are other heirs who are interested in the account, and ought to be before the court. The answer is, that the other heirs have commenced no proceedings to recover their interest in the premises, and perhaps never will. They will not be in the least affected by the decree, and are therefore not interested in the account.

As to the other grounds of appeal, it is sufficient to say, that I agree with the Chancellor, for the reasons he has assigned; and upon the whole, am of opinion that the decree should be affirmed.

The decree of the Court of Chancery was reversed by the following vote:

*For affirmance*—Judge ELMER.

*For reversal*—CHIEF JUSTICE, Judges OGDEN, POTTS, RYERSON, VREDENBURGH, COMBS, SWAIN, CORNELISON, RISLEY, VALENTINE, HAINES.